624 A.2d 36

A.K., PLAINTIFF/RESPONDENT, v. S.K.,
DEFENDANT/APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 10, 1993—Decided April 26, 1993.

Before Judges HAVEY, STERN and BROCHIN.

*Skoloff & Wolfe,* attorneys for appellant (*Stephen P. Haller,* of counsel and on the brief).

*Wilentz, Goldman & Spitzer,* attorneys for respondent (*David M. Wildstein,* of counsel and on the brief; *Douglas K. Schoenberg,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

This is an appeal from an order of the Family Part denying defendant's motion seeking HLA blood testing to ascertain whether he is the biological father of the three children he previously considered his own. Defendant desires to contest his support obligation on the grounds that he is not the biological father. His application, filed in opposition to plaintiff's post-judgment enforcement motion, also sought an order "allowing defendant to cease

payment of alimony and support to the plaintiff" until parentage was determined. The Family Part rejected defendant's application based on the "entire controversy doctrine" because the issue was not raised in prior proceedings, either before or after final judgment was entered. Employing the doctrine of equitable estoppel, we affirm. We also affirm the order awarding plaintiff $5,170.00 in post-judgment counsel fees.

The parties were married in 1975. At first the parties were unsuccessful in conceiving a child, but plaintiff ultimately became pregnant in 1976. The three children were born in 1977, 1979, and 1982. Prior to entry of a Property Settlement Agreement which was embodied in the 1988 final judgment of divorce, defendant was supporting the children and considered himself their father.

Defendant was diagnosed as suffering from Hodgkin's Disease in 1971 and was treated with radiation and chemotherapy. In 1976, when plaintiff could not become pregnant, semen tests revealed an insufficient sperm count on his part. However, when plaintiff subsequently became pregnant defendant concluded that the test results were wrong or that circumstances changed,[1] and therefore never contested the legitimacy of the children.

In denying the request for HLA testing, made after prior post-judgment proceedings in this ongoing matrimonial litigation, the trial judge concluded that defendant was "barred by the entire controversy doctrine in pursuing this matter now" for various

---

[1] In his brief defendant relies on his certification filed in the trial court and "the additional information contained within a supplemental certification" filed directly with us, "which sets forth the additional information which would have been provided to the [trial] [c]ourt had it granted a *Lopez* [*v. Swyer,* 62 *N.J.* 267, 300 *A.*2d 563 (1973),*] type hearing to determine the extent of [his] knowledge at this time." We have accepted the supplemental certification for purposes of determining whether any dispute as to material issues exists warranting a hearing, and for present purposes, have considered the contents of the supplemental certification as if they were uncontested. In that certification defendant asserts reasons why he believed "the initial sample tested in 1976 was highly suspect."

reasons, including the fact that defendant knew of the test results before the divorce proceedings were commenced and had the type of "suspicions" which required him to pursue the issue earlier. The judge held that by "pursuing custody of the children" even after entry of the judgment, and by not contesting parentage earlier, defendant was estopped from doing so now.

Defendant claims that the issue of parentage is not barred by the entire controversy doctrine or any other procedural bar because his attitude towards the children's legitimacy was the result of "fraudulent misrepresentations" by his former wife, and because his present action is based upon post-judgment discovery following a new marriage and new testing which confirms his inability to produce semen for fertilization. Since the case was submitted to us, the parties have submitted letters to the effect that defendant's new wife is now pregnant. Defendant argues his new wife was able to conceive only after he had bilateral varicocele surgery, thus confirming his pre-surgical condition. We do not pass upon the form or impact of these new submissions which would further supplement the record because they are not material to our determination.

The plaintiff wife points to the long history evidencing defendant's attitudes and conduct as father of the children. She also points to pre-complaint joint discussions with a marriage counselor on the issue of legitimacy and to the existence of unfiled draft pleadings she claims to have seen in which defendant alleged that L.K., born in 1977, was not his child and was the child of a third party. Plaintiff thus contends that it is apparent that the paternity issue was the subject of controversy and negotiation between the parties prior to the execution of the settlement agreement in which joint custody was granted.

While defendant asserts various reasons for his attitude at the time, it is uncontested that "[i]n approximately 1985 ... in the course of 'marriage counseling,' ... plaintiff stated that the defendant was not the biological father of [L.K., the oldest child]." Defendant states plaintiff told him of an extra-marital relationship

"which ... had begun before [L.K.] was conceived," that she appeared to tell him this and "provided the name of her biological father" "in an angry moment," and that she subsequently made "repeated denials" on which defendant relied. Plaintiff now insists that all three children were fathered by defendant, and defendant states that even during the counseling exchange "[s]he steadfastly asserted ... that the two other children were defendant's."

It is also uncontested that after the divorce complaint was filed defendant prepared a counterclaim and "third party claim" alleging that L.K. was not his child, and that plaintiff and an unnamed third party conspired "to conceal ... that this child was, in fact, the child of the third party defendant." There appears to be no contest to the fact plaintiff's counsel obtained a copy of the draft, apparently as part of the settlement negotiations. Defendant never filed those pleadings. However the judge referred to the draft, without objection, in his opinion denying the application we review.

The need for litigation was initially resolved in a "Property Settlement Agreement" dated September 28, 1988, in which the parties agreed to "joint legal custody," with the wife having "physical custody" and defendant enjoying "reasonable and liberal rights of visitation including overnight time during vacations, holidays and on weekends." Other provisions related to the children's welfare and support,[2] and it is clear from the agreement that, although not so expressed therein, any question of parentage was abandoned. The agreement expressed the parties' "desire ... to enter into an agreement dealing with the care and custody of *their* children." (emphasis added).

Following the entry of judgment defendant filed at least two applications seeking physical custody, and the issue of custody was considered in continuing litigation. On April 11, 1990, the Family Part, after appointment of a guardian *ad litem* for the children,

---

[2] Defendant agreed to pay annual child support of at least $10,000 per child.

made "temporary modifications of visitation and custody," granting "joint physical custody on a temporary basis" with primary physical custody alternating between the parties, as detailed by the court. On November 15, 1990, the parties entered into another consent agreement returning primary physical custody to plaintiff. It appears that the issue of parentage again was not contested during these proceedings, nor when the court-ordered post-judgment custodial evaluation was conducted.

The children are now 15, 13 and 10 years old. They grew up with the belief that both parties were their parents. We conclude that defendant may not now contest his support obligation to the children.

In *Jensen v. Jensen*, 13 *N.J.Super.* 155, 80 *A.2d* 244 (Ch.Div. 1951), plaintiff husband alleged that the youngest child born to his wife during their marriage was not his, but rather the result of an adulterous affair. His wife denied the allegation, plaintiff abandoned the contention, and the matter proceeded to trial without dispute over paternity. Custody was awarded to the mother, and plaintiff was ordered to pay child support. After judgment was entered, plaintiff moved for an order requiring defendant and her child to submit to blood tests based on questions of paternity. The court denied the motion, pointing out that the affidavits submitted in support of the motion revealed that plaintiff had been aware of the alleged adultery immediately after the child was born. Plaintiff had nevertheless elected to abandon his claim that the child was illegitimate and allowed the divorce action to proceed without contest as to paternity. Judge Hegarty therefore declined to reopen the proceedings, holding that plaintiff "abandoned [the] right [to a blood-grouping test] when the divorce case was heard." *Id.* at 159, 80 *A.2d* 244.

In *Ross v. Ross*, 126 *N.J.Super.* 394, 400, 314 *A.2d* 623 (J & D.R.Ct.1973), *aff'd o.b.*, 135 *N.J.Super.* 35, 342 *A.2d* 566 (App.Div. 1975), the Juvenile and Domestic Relations court rejected an attempt to deny paternity in a support action commenced after defendant left the child's mother who he married when the child

was sixteen months old. After the marriage defendant father filed a "certificate of admission of paternity with the Bureau of Vital Statistics in Trenton," 126 *N.J.Super.* at 396, 314 A.2d 623, and the child (aged seven at the time of the hearing) believed defendant was his father. The court looked to the potential impact of the application on the child who was deemed "the real party in interest," *id.* at 400, 314 A.2d 623, and noted the risk of "irreparable harm and . . . deep injury" a change in the relationship would have, *ibid.* The court employed the doctrine of "equitable estoppel" to prevent defendant from changing his position as to parentage.

Similarly, in *A.S. v. B.S.*, 139 *N.J.Super.* 366, 354 A.2d 100 (Ch.Div.1976), *aff'd o.b.*, 150 *N.J.Super.* 122, 374 A.2d 1259 (App. Div.1977), equitable estoppel was employed to prevent a former husband from avoiding support of a child delivered to the parties at the age of one month for purposes of guardianship. While plaintiff and defendant had never adopted the child and the former wife received custody at the time of divorce, the court concluded "that for the first 12 years of his life this child was brought up as the son of the parties hereto . . . [who both] accepted . . . responsibility . . . [for him and] prevented [him] from being raised by any other individuals through their action." 139 *N.J.Super.* at 372, 354 A.2d 100. The court therefore held that neither party could now avoid the obligation they had assumed. *Ibid.*[3]

More recent precedent are also analogous and support our conclusion. In *B.P. v. G.P.*, 222 *N.J.Super.* 101, 536 A.2d 271 (App.Div.), *certif. denied*, 108 *N.J.* 579, 531 A.2d 1354 (1987), relied on by the trial judge here, we held that plaintiff former wife's failure to file a complaint under the Parentage Act, *N.J.S.A.* 9:17–38 *et seq.*, at the time of her divorce complaint, barred her subsequent action "seeking to establish [a third party] as the boy's

[3] The Supreme Court referred to both *Ross* and *A.S.* with approval when it addressed application of the equitable estoppel doctrine in the context of a stepparent's support obligation. *See Miller v. Miller*, 97 *N.J.* 154, 162-167, 478 A.2d 351 (1984).

father." 222 *N.J.Super.* at 103, 536 *A.*2d 271. Plaintiff had "gained child custody and child support by an agreement" with her former husband in the prior matrimonial proceedings. *Ibid.* We noted that the Parentage Act, *N.J.S.A.* 9:17–46a, required that an action thereunder "shall be joined with an action for divorce," 222 *N.J.Super.* at 104, 536 *A.*2d 271, and concluded that "the single or entire controversy doctrine is applicable to Parentage Act proceedings and constitutes a bar to both the claim against" the third party as well as the former husband, *id.* at 105, 536 *A.*2d 271. We further concluded that "the absence of any specific language in the Parentage Act abrogating the [entire controversy] doctrine, reinforces the applicability of the doctrine to a Parentage Act proceeding." *Id.* at 107. While we did not find the doctrine of *res judicata* applicable "because the paternity issue was not actually litigated in the divorce action," we cited out-of-state authority "for application of a doctrine of repose as between parties to a paternity action following entry of a divorce judgment incorporating agreement between the same parties resolving child custody and child support." *Ibid.*

In the present matter, of course the former wife presumably knows more about possible parentage than the former husband, and no new complaint was filed after disposition of the marital action. But the post-judgment bar to relitigation should be equally applicable in these circumstances, where the extra-marital relationship was known and a question of parentage was raised by defendant before a property settlement agreement was executed and judgment was entered in the dissolution proceedings.

In *Savoie v. Savoie*, 245 *N.J.Super.* 1, 583 *A.*2d 762 (App.Div. 1990), we considered whether plaintiff was equitably estopped from declining to support a grandchild, J.L., who lived with the parties since birth to their daughter who was hospitalized in a mental institution. Plaintiff had previously sought custody of the child, consented to an order requiring him to pay support, and had "assumed an *in loco parentis* relationship with the grandchild since three days following her birth." *Id.* at 4, 583 *A.*2d 762. We therefore concluded that, despite no statutory obligation, plaintiff

was equitably estopped from supporting his granddaughter. As Judge Coleman wrote:

Because plaintiff voluntarily undertook to provide support for J.L. and to rear her, he will now be equitably estopped from repudiating that obligation. Plaintiff voluntarily undertook to support and raise the grandchild, and since plaintiff's conduct effectively excluded J.L. from being placed for adoption, J.L. now has no other place to turn for support. "To protect children from the whims of those who, for several years, treated them as their own, courts have held that both 'adoptive' parents must be estopped from denying their duty to support the child." *Miller v. Miller*, 97 *N.J.* 154, 166, 478 *A*.2d 351 (1984); *A.S. v. B.S.*, 139 *N.J.Super.* 366, 369–372, 354 *A*.2d 100 (Ch.Div.1976), aff'd 150 *N.J.Super.* 122, 374 *A*.2d 1259 (App.Div. 1977). We hold that the trial court correctly held that plaintiff is obligated to provide support for J.L. To hold otherwise would inflict irreparable harm on the child.

[245 *N.J.Super.* at 5, 583 *A*.2d 762].

In *M.F. v. N.H.*, 252 *N.J.Super.* 420, 599 *A*.2d 1297 (App.Div. 1991), plaintiff sought to affirmatively prove through blood testing that he, and not the mother's husband, was the biological father of her child. In light of the statutory "presumption of the paternity of the mother's husband," *see N.J.S.A.* 9:17–43(a)(1), and given "the fact that the mother's husband ... ha[d] acknowledged [parentage of] the child," we held that the trial court could not order blood tests until it had determined, "on appropriate proofs, that establishment of plaintiff's paternity and the rebuttal of the husband's paternity [would] serve the best interests of the child." 252 *N.J.Super.* at 427, 599 *A*.2d 1297. We expressly held "that the court may not order blood tests or permit the action to continue where the plaintiff's claim of paternity conflicts with the presumption established in *N.J.S.A.* 9:17–43a(1), unless the court determines by clear and convincing evidence that it is in the best interests of the child." *Id.* at 429, 599 *A*.2d 1297. We thus remanded for a determination of the child's best interests, based on "all of the factors which weigh upon the issue of the benefit or detriment of the child." *Ibid.* The remand in *M.F.* followed affirmative proofs by plaintiff that he was the father and was willing to assume his responsibilities as such, and we recommended consideration of whether a guardian *ad litem* should be appointed for the benefit of the child. *Id.* at 430, 599 *A*.2d 1297.

*M.F.* thus involved a claim by a plaintiff that he was the father and an indication that he would honor the support obligation. But even under the circumstances in *M.F.*, the plaintiff therein had no automatic entitlement to blood testing because of the statutory presumption and the best interests of the child.

Also analogous is our recent decision in *N.M. v. J.G.*, 255 *N.J.Super.* 423, 605 *A.2d* 709 (App.Div.1992). There plaintiff-mother brought a paternity action against a putative father who was permitted to join plaintiff's former husband as a party. The former husband's name was on the birth certificate as the father, and he was ordered to pay support in the prior divorce proceedings. The trial court amended the paternity complaint *sua sponte* to add the child as a plaintiff and appointed a guardian *ad litem* who thereafter reported that a determination of parentage would be in the best interests of the child who was then having an "identity crisis." *Id.* at 427–28, 605 *A.2d* 709. In ordering the mother, child, and the putative and legal fathers to undergo blood testing, the trial court stated that it had no doubt "that the child has the right to know who his father is." *Id.* at 428, 605 *A.2d* 709.

We reversed the order directing the blood testing and held that the "entire controversy doctrine" barred plaintiff's claim because plaintiff's "paternity action should have been joined with the divorce action." *Ibid.* We also held that "plaintiff's claims are precluded by principles of judicial estoppel which bar a party to a legal proceeding from arguing a position inconsistent with one previously asserted," *id.* at 429, 605 *A.2d* 709, because her present position was inconsistent with that taken in the divorce proceedings.

In *N.M.* we also held that the child, through his appointed guardian, was not barred from seeking blood testing. This flowed from the fact that the child had "previously" taken no position in the prior matrimonial litigation and "because of the child's 'consummate' interest in the outcome." *Id.* at 429–30, 605 *A.2d* 709. We further noted that "the trial judge should have ordered [the former husband] to undergo the HLA test to which he consented,"

*id.* at 433, 605 *A.*2d 709, although no inquiry as to defendant's parentage was appropriate until after "the presumption [of the former husband's] paternity was rebutted." *Ibid.*

▪   Here, no party contends that a guardian should be asked to take a position on the question of parentage, and given the fact that the children can raise the question of parentage until each becomes 23 years of age, *see N.J.S.A.* 9:17–45(b); *N.M. v. J.G., supra,* 255 *N.J.Super.* at 430, 605 *A.*2d 709, as well as the presumption of parentage and the absence of any other party claiming to be father and willing to assume responsibilities as such, we decline to direct the appointment of a guardian to assert that blood testing is now in the children's best interests. We prefer to address the only issue before us, namely whether defendant can obtain the testing as a means of contesting parentage and his support obligation.

▪   There may be some contested questions of fact related to plaintiff's alleged extra-marital affair, and the knowledge defendant acquired regarding it. The parties may also differ as to how this knowledge impacted upon the reasonableness of defendant's conduct and attitudes in light of the knowledge of his own physical condition. We understand that plaintiff allegedly told defendant he was not the father of only one of the three children. But based on what appears uncontested concerning defendant's knowledge at the time he entered the property settlement agreement, including what plaintiff had previously told him and his own fertility test results, as well as his post-judgment conduct and the children's present source of support, defendant is equitably estopped from contesting his support obligation even though the issue is raised by post-judgment application in the original case. *Compare Cafferata v. Peyser,* 251 *N.J.Super.* 256, 260, 597 *A.*2d 1101 (App.Div. 1991) (entire controversy doctrine no bar where plaintiff unaware of facts at time of prior settlement).

Unlike *M.F.* and *N.M.,* in this case no support is sought from a third party putative father. Thus, if ultimately successful, defendant's present claim would leave the children without support and

the economic and emotional well-being that accompanies it, to their detriment.[4] *See Savoie v. Savoie, supra;  A.S. v. B.S., supra; Ross v. Ross, supra.* In the circumstances, the doctrine of equitable estoppel therefore prohibits defendant from now seeking to avoid his support obligation on the grounds that he is not the father.[5]

Particularly given the absence of any other party to this action who might be responsible for their support we see no basis for concluding that our holding is contrary to the children's present best interests because of their right to know who their father is, or otherwise. As noted, the children are not barred from raising in the future, until each becomes twenty-three years of age, a parentage claim against any third party. *See N.M., supra; see also* D.M. Zupanec, Annotation, *Effect, in Subsequent Proceedings, of Paternity Findings on Implications in Divorce or Annulment Decree or in Support on Custody Order Made Incidental Thereto,* 78 *A.L.R.*3d 846, 852, 864–868 (1977).

We likewise conclude that the award of post-judgment counsel fees did not constitute an abuse of discretion. Accordingly, the order is in all respects affirmed.

---

[4] During the matrimonial proceedings, plaintiff may also have asserted a greater interest in the marital assets and negotiated for further alimony had defendant questioned his obligation to support the children. Moreover, had defendant raised the issue earlier, plaintiff would have had the option of seeking child support from a third party.

[5] In light of our disposition, we do not address whether the doctrine of judicial estoppel applies.